IRVINE CO. v. BOND et al.

(Circuit Court, S. D. California. May 25, 1896.)

No. 610.

JURISDICTION OF FEDERAL COURTS — CITIZENSHIP — CONVEYANCE TO FOREIGN CORPORATION TO GIVE JURISDICTION.

A citizen of California, claiming to own certain lands and water rights, procured the organization, entirely at his own expense, of a corporation under the laws of West Virginia. He owned all the stock, causing one share each to be issued to his attorney, his wife, and three of his employés, to qualify them for directors and officers. He then conveyed to the corporation the said lands and water rights. His purposes were to operate and develop the property through this corporation, without endangering other property owned by him; to secure through it the right of eminent domain; and also to enable him to litigate the title to the property, which was threatened with attack, in the federal courts. *Held,* that under these circumstances the court would not be justified in finding that the conveyance to the corporation was collusive and fictitious, merely for the purpose of invoking the federal jurisdiction, and that a plea based on that ground must be overruled.

This was a suit in equity by the Irvine Company, a corporation created under the laws of West Virginia, against John S. Bond and others, citizens of California, to establish and quiet title to certain lands and water rights. The cause was heard upon a plea to the jurisdiction.

Thos. B. Bishop and Lamme & Wilde, for complainant.

White & Monroe, William T. Kendrick, and Victor Montgomery, for defendants.

ROSS, Circuit Judge. This is a suit in equity, brought by the complainant, alleged to be a corporation organized and existing under the laws of the state of West Virginia, against a large number of persons alleged to be citizens and residents of the state of California, to procure a decree establishing and quieting, as against the adverse claims of the defendants, complainant's alleged right to the waters of a certain stream called "Santiago Creek," in Orange county, Cal., and an injunction enjoining the defendants from interfering with any of the said waters or the dams, ditches, flumes, etc., by which the complainant alleges it diverts the waters for domestic use, irrigation, and other beneficial purposes; the complainant basing its alleged rights upon its alleged ownership of the Rancho Lomas de Santiago, situated in said county of Orange, containing about 48,000 acres of land, and of an adjoining tract of 12,000 acres of the Rancho Santiago de Santa Ana, through which latter tract, it is alleged, the Santiago creek runs in its natural channel, and riparian to which, it is averred, are all the lands so alleged to be owned by complainant. The defendants Lotspeich filed a plea to the jurisdiction of the court, averring, in substance, that the court ought not to take cognizance of the suit, for the reason that it does not really and substantially involve a suit or controversy properly within the jurisdiction of this court; that the complainant has been improperly and collusively made such for the sole purpose of creating

a case cognizable herein; that the Irvine Company is not the real party in interest, but a nominal party only; that on the 28th day of July, 1894, and until the times mentioned in the bill as amended, James Irvine was, and ever since has been, a citizen of the state of California; that on the day named he signed and acknowledged in form a conveyance purporting to transfer all the lands, water, and water rights described in the amended bill to the Irvine Company, but that the transfer was not real or actual, but was and is fictitious, nominal, and colorable only, and was made, acknowledged, and recorded by James Irvine, by collusion with the complainant corporation, for the sole purpose of creating a fictitious ground for federal jurisdiction, and thereby preventing and avoiding the trial of the title to the waters in controversy in the county where they are situated; that complainant has not, nor does it claim to have, any interest in or to the land or water except what it derived through the purported conveyance from James Irvine, who, the plea alleges, has ever since continued to be the real party in interest in the property. And, as further tending to show that the apparent interest and title of the complainant corporation is, in fact, nominal, fictitious, and colorable, the plea alleges, in substance, that the Irvine Company was created a corporation under and by virtue of the laws of the state of West Virginia on the 4th day of June, 1894, at the instance of James Irvine, with a subscribed capital stock of $500 only, and so continued at the time the purported conveyance from James Irvine was recorded; that the property alleged in the amended bill to be vested in the corporation complainant is of the value of at least $2,000,000; that the five incorporators of the complainant corporation are all young men, with very limited means, and otherwise lacking in influence or ability to manage the property; that the whole property continues in the possession and under the control of James Irvine, and the former attorney and present attorney of James Irvine is also attorney for the complainant corporation, and one of its directors; that at the time the corporation was created, and for some weeks prior thereto, James Irvine had notice of the adverse claims of the defendants to all the waters of the Santiago creek, and said James Irvine was expecting and fearful that the defendants would begin suit in the superior court of Orange county, state of California, against him to quiet their title to the waters and water rights against the claims of James Irvine, and to enjoin him from diverting the waters of the creek, or any part thereof; that on the 19th day of July, 1894, all the defendants to this suit did commence an action to quiet their title to all the waters and water rights in controversy in the superior court of Orange county, Cal., and at the same time did file a notice of the pendency of the action, containing the names of the parties, the object of the action, and a description of the property affected thereby, and, in anticipation of the service of process in that action, and for the purpose of avoiding process therein, James Irvine fled from the said county of Orange, and willfully avoided service of summons therein, and remained in hiding until he had executed the aforesaid purported conveyance to the complainant corporation, and

until this suit was brought by the complainant corporation, and until August 17, 1894, at which time service was made of the summons and copy of the complaint in the action brought by these defendants in the superior court of Orange county, Cal., on James Irvine; that at the time the defendants to this suit filed their suit against James Irvine complainant corporation had notice of its commencement, and that it received its purported conveyance from James Irvine with notice thereof; and that James Irvine and complainant corporation, by collusion, for the purpose of creating apparent jurisdiction in this court, and for no other purpose, caused the purported conveyance of July 28, 1894, to be signed, acknowledged, and recorded in the recorder's office of Orange county, Cal. The complainant having caused the plea to be set down for argument, the court, on the hearing, in accordance with the established rule in equity, accepted as true all the facts alleged in the plea, and upon the facts as thus alleged the court held, and properly held, that the transfer of the property in question from James Irvine to the complainant corporation was fictitious and colorable merely, and that James Irvine in truth remained the real owner of the property pretended to be conveyed by the conveyance to the complainant, and accordingly sustained the plea, with leave to the complainant, if it should be so advised, to reply to the plea, and take issue in respect to the matters of fact therein alleged, within 10 days from that date. Pursuant to the leave so given, the complainant filed a replication to the plea, and upon the issues thus joined testimony was taken on behalf of the respective parties.

The evidence shows that the allegations of the plea to the effect that James Irvine, in anticipation of the service of process upon him in the action brought by the defendants against him in the state court for Orange county, and for the purpose of avoiding process therein, fled from that county, and remained in hiding until August 17, 1894, and until after he had executed the deed to the complainant corporation, is not true. There was no secrecy about his leaving Orange county for his home in San Francisco, and at no time was there any hiding on his part for the purpose of avoiding service of process upon him in the suit brought against him by the defendants to this suit, so far as appears from the evidence. On the contrary, it appears that for several years prior to the actual commencement of the suit by the defendants a dispute had existed between the respective parties in regard to the waters in question, and James Irvine had frequently expressed his desire that suit should be brought by the defendants to settle the controversy. Nevertheless, suit was not brought by them until July 19, 1894. In the meantime, James Irvine had consulted with his attorneys in respect to the controversy with the defendants, among other things. The reasons for his actions as disclosed by the evidence will be referred to hereafter. What he actually did was this: He sent one of his attorneys at law to the state of West Virginia for the purpose of causing to be organized under the laws of that state the complainant corporation, called the Irvine Company, with the intention of conveying to that corporation the property described in the deed.

executed by him to the complainant. With that end in view, one of the attorneys for James Irvine went to Charleston, W. Va., and there employed the firm of Chilton & Thayer to incorporate the Irvine Company under the laws of that state. The agreement under which that was done was that Chilton & Thayer should procure the necessary number of citizens of the state of West Virginia to execute articles of incorporation under the laws of that state, each of whom should subscribe for enough of the stock of the corporation to make their action legal, and perfect the organization by the election of officers, and thereupon adopt by-laws and a seal, and then pass a resolution authorizing a meeting of the stockholders under the by-laws to be held in Los Angeles, Cal., whereupon each of the stockholders should execute a proxy to the attorney of James Irvine, whereby he could vote their stock at such meeting. This agreement was carried out, and the Irvine Company was incorporated under the laws of West Virginia. The purposes of the company, as expressed in the articles of incorporation, were: "Acquiring water rights, constructing waterworks and systems for distribution, use, and sale of water for irrigation, domestic use, power purposes, and other useful objects; carrying on the business of. stock and general farming, and therein acquiring real and personal property, and holding, using, and disposing of the same in any manner; constructing, maintaining, and disposing of power plants and power systems for use, distribution, and sale of dynamic energy; constructing, maintaining, and operating telegraph and telephone or other lines of communication; and, in connection with its business, constructing, maintaining, and operating railroads with car service to be propelled by electric or other power; and, in connection with its business, doing any and all things that a natural person might or could do with its property acquired in whatsoever manner." The articles of incorporation provide that the corporation shall keep its principal office or place of business at Charleston, in the county of Kanawha, state of West Virginia, and recite that the incorporators "have subscribed the sum of five hundred dollars to the capital thereof, and have paid in on said subscriptions the sum of fifty dollars, and desire the privilege of increasing the said capital by the sale of additional stock, from time to time, to five million dollars in all." "The capital so subscribed," proceed the articles of incorporation, "is divided into shares of one hundred dollars each, which are held by the undersigned respectively as follows," that is to say: by John A. Thayer, one share; H. P. Devenshire, one share; Bilton McDonald, one share; A. W. Jackson, one share; F. H. Scott, one share,—all of Charleston, West Virginia. The articles of incorporation further declare that "the capital to be hereafter sold is to be divided into shares of the like amount." The $50 actually paid by the incorporators, although nominally advanced by them, were so advanced under the agreement that the advances should be repaid by James Irvine, and were so repaid, as were also all other moneys expended in and about the incorporation of the complainant company and in payment for its stock. The attorney for James Irvine immediately returned to California, with a proxy from each of the

incorporators to vote their stock at a meeting to be held in California pursuant to the resolution passed in West Virginia, authorizing a meeting of the stockholders under the by-laws to be held at Los Angeles. Prior to the holding of that meeting, one share each of the stock was issued to three persons, each of whom was in the employ of James Irvine. Those three, together with the attorney of James Irvine, who held the proxy of the West Virginia incorporators, held a meeting in Los Angeles, at which the West Virginia directors and officers, through the attorney of James Irvine, who held their proxy, tendered their resignation to the three employés of James Irvine, to whom one share of stock each had been issued. Those three accepted the resignations so tendered, and proceeded to elect themselves officers of the corporation. All of the citizens of West Virginia who thus incorporated themselves as the Irvine Company thus speedily dropped out of the company, and the corporation which, according to the express declaration of its articles, was required to "keep its principal office or place of business at Charleston, in the county of Kanawha, and state of West Virginia," and was to continue until June 1, 1944, was thus, in the year 1894, transferred to the city of Los Angeles, state of California. To the corporation thus formed, James Irvine subsequently, and on July 27, 1894, executed a deed, purporting to grant to the Irvine Company all of his right, title, and interest in and to the Rancho Lomas de Santiago, and in and to the San Joaquin Rancho, and in and to the Rancho Santiago de Santa Ana, in consideration of 10,000 shares of the stock of the complainant corporation of the par value of $1,000,000, which were issued and delivered to him. Subsequently he executed to the complainant corporation a conveyance of all of the personal property on the land described in his deed to the company in consideration of the issuance and delivery to him of 1,000 shares of the stock of the complainant corporation, of the par value of $100,000. One other share of the stock was issued to Frances Anita Irvine, wife of James Irvine, who was thereupon elected to the board of directors of the complainant company. The evidence shows that for several years prior to the organization of the complainant company James Irvine had been discussing with his counsel the advisability of organizing a corporation to which to convey the property above mentioned, having in view the development and operation of it to greater advantage than could result with the title in himself. The evidence shows that he contemplated subdividing the lands and introducing an extensive and expensive irrigation system, among other things, and that, as he was possessed of other property than that here mentioned, it would be to his advantage to cause a corporation to be formed in a state under whose laws there was no individual liability of stockholders, to which corporation he could convey this particular property in consideration of the stock of the corporation, and, through the corporation, develop and operate this property without endangering his other property. The evidence shows that another object of the proposed corporation was to secure by the corporation the right of eminent domain, the exercise of which might become necessary in

furtherance of the contemplated scheme of irrigation. Another object, according to the evidence, was the securing of the right to try the title to the property, which was threatened with attack, in the courts of the United States, through which government the title came to James Irvine. These and other considerations, the evidence shows, induced counsel of James Irvine to advise him to cause the Irvine Company to be incorporated under the laws of the state of West Virginia, and to perform the other acts hereinbefore recited. The evidence further shows that it was never agreed or contemplated that the title to the property should be reconveyed to James Irvine, but, on the contrary, that the intention was that the title should remain in the corporation.

Whatever effect, if any, the transactions attending the organization of the complainant company, and those that followed, might have in respect to the continued existence of the corporation, the court would not be justified, I think, in view of the evidence that has been introduced, in holding that the conveyance from James Irvine to the complainant company was fictitious, and not real. Being real, and intended for what it purported to be, a conveyance of the title of the property to the corporation, the power over which was thereafter vested in a board of directors, and no reconveyance to James Irvine being contemplated, the plea must be overruled. Manufacturing Co. v. Kelly, 160 U. S. 327-336, 16 Sup. Ct. 307, and authorities there cited. An order to that effect will be entered, with leave to the defendants to answer within the usual time.